IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 106-074 |
| | ) | |
| GARY SHANE CHILDERS | ) | |

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2006 OCT 11 A 10: 20
CLERK _____
SO. DIST. OF GA.

---

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has accused Defendant Gary Shane Childers ("Childers") of one count of Conspiracy to Manufacture Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one count of Possession of a List I Chemical with Intent to Manufacture a Controlled Substance, in violation of 21 U.S.C. § 841(c)(2). The matter is now before the Court on Childers's motion to suppress all evidence seized as a result of a search conducted on November 9, 2005, at 297 Kilpatrick Street, Midville, Burke County, Georgia, as well as any and all incriminating statements made after his arrest on that same date.[1] The Court held an evidentiary hearing on the matter, at which time the Court heard testimony from Childers, Co-Defendant James Lester Kimbrell, III ("Kimbrell"), and Stephen Weddon, Chief of the Midville Police Department ("Chief Weddon"). Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that Childers's motion to suppress be **DENIED**. (Doc. no. 16).

---

[1] The motion was originally filed on behalf of Childers and his co-defendant. However, as a result of plea negotiations with the government, the co-defendant abandoned the motion, appearing at the hearing only as a hostile witness for Childers.

I.  **FACTS**

The events giving rise to the challenged search were set in motion approximately two days prior the point at which law enforcement officials arrived at the residence located at 297 Kilpatrick Street in Midville, Georgia ("the Residence"). Kimbrell invited Childers to ride with him from Tennessee to Georgia,[2] and the two intended to stay at the Residence, which is owned by Kimbrell's father. At the time, Kimbrell was on parole in Tennessee and was not authorized to leave the state. Nevertheless, Kimbrell had a key to the Residence and intended to stay at the Residence, even though he had not informed his father of his intention to do so. Although Kimbrell testified that he had used the Residence three to four times over the years and that his father had not previously objected to Kimbrell bringing friends to the Residence, he admitted that on this occasion, he did not tell his father that he was going to the Residence because he knew that he should not have been outside of Tennessee. Kimbrell also acknowledged that had his father requested it, he (Kimbrell) would have been required to leave the Residence. Additionally, Kimbrell conceded that his father would not have authorized the Residence to be used for the methamphetamine manufacturing that the evidence collected during the contested search strongly suggested was occurring.

Upon arriving at the Residence, Kimbrell allowed Childers access to the key to the Residence and told Childers to "make himself at home." Childers put his back pack containing toiletry items and a change of clothes inside the Residence.[3] During his

---

[2]Kimbrell and Childers previously met when they were both incarcerated at the same penal institution.

[3]There was a discrepancy in the hearing testimony as to which bedroom within the Residence Childers used during his stay. However, because the specific bedroom where

approximately two-day stay at the Residence, Childers had unfettered access to the Residence.

On the morning of November 9, 2005, Chief Weddon initiated a traffic stop on a car driven by Kimbrell because a check of the vehicle tag revealed that the car had been reported stolen in Tennessee on October 24, 2005. (Doc. no. 16, Pardue Aff., ¶ 3). Not only had the car been reported stolen, but Chief Weddon also found ammunition in the vehicle and unopened boxes of ephedrine pills.[4] Although officers arrested Kimbrell at the scene of the traffic stop, before taking him to jail, they took Kimbrell to the Residence. Chief Weddon testified that based on recent reports he had received from a concerned citizen, he had reason to suspect that there were illegal drugs at the Residence.

Childers had been sleeping when law enforcement officials arrived at the Residence with Kimbrell already in custody. At the time Chief Weddon discovered that Childers was in the Residence, Kimbrell had already told Chief Weddon that because his (Kimbrell's) father owned the Residence, he (Kimbrell) could not grant permission to search. Chief Weddon also asked Childers for permission to search, but Childers refused. Knowing that neither Kimbrell nor Childers owned the Residence, Chief Weddon telephoned Kimbrell's father, the owner of the Residence, and asked for permission to search. Although Kimbrell's

---

Childers stayed is not determinative of the issues in this motion, the Court need not resolve the conflicting testimony.

[4]As Kimbrell is a convicted felon, he was prohibited from possessing firearms and ammunition.

3

father verbally granted permission to search, Chief Weddon waited for the written consent to arrive via facsimile before starting the search.[5] (See Gov't Ex. 1).

The results of the search of the Residence were described as follows:

> On entrance we found a 22 Califber Derringer in the side of the recliner chair. With further investigation we found more Ephedrine pills [-] some in boxes and some in their blister packages[. O]n search of the first bedroom Deputy Tanner found a Pyrex pan containing a jar with a white shaved substance and a razor knife. In the kitchen we found 3 containers with what we believed to be Ephedrine pills and some of type of liquid chemical together to produce methamphetamine. We found other chemicals and a glass container in the freezer which also contained a liquid chemical and a white powder residue.

(Pardue Aff., ¶ 3 (quoting Chief Weddon's Incident Report at Bates 87-88)).[6] The only item claimed by Childers in the Residence was his back pack, and he consented to let Chief Weddon look in that bag.[7]

As both Kimbrell and Childers were arrested as a result of the morning's events, they were taken to the Burke County Law Enforcement Center, where they were interrogated. Both Kimbrell and Childers made incriminating statements to law enforcement officials after they were arrested.

---

[5] There is no dispute that Kimbrell's father voluntarily gave his consent for the search of the Residence.

[6] At the hearing, Chief Weddon described in detail the drug paraphernalia, as well as its location, that was recovered from the Residence. Moreover, the government submitted as exhibits, pictures of the Residence and the items that were discovered during the search. (See Gov't Exs. 2, 4-13).

[7] The record does not indicate that any incriminating evidence was discovered in the back pack.

## II. DISCUSSION

### A. Reasonable Expectation of Privacy

The Court starts with the issue of whether Childers has "standing" to challenge the search of the Residence.[8] As the Supreme Court has clarified, the relevant inquiry involves a two-part analysis: first, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and [second,] that his expectation is reasonable," that is, recognized and permitted by society. Minnesota v. Carter, 525 U.S. 83, 88 (1998); see also Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (contesting the legality of a search under the Fourth Amendment requires a defendant to demonstrate a legitimate expectation of privacy in the place or item searched by showing a subjective expectation of privacy which society is prepared to recognize as legitimate). Childers has the burden of establishing that, under the totality of the circumstances, the contested search violated his legitimate expectation of privacy in a particular place. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

Here, Childers has not met his burden. Childers relies heavily on the argument that as a guest in the Residence, he had a legitimate expectation of privacy. Citing Minnesota v. Olson, *supra*, Childers argues that as an overnight guest of Kimbrell, he had a legitimate expectation of privacy in the Residence that society is prepared to recognize as reasonable. Under Childers's theory, because he was a guest of the son of the owner of the Residence,

---

[8]The Court uses the government's terminology of "standing" but notes the Supreme Court's admonition, "But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." Rakas v. Illinois, 439 U.S. 128, 139 (1978).

5

and because he (Childers) was unaware that the son (Kimbrell) did not have authorization from his father to be in the Residence, he should be entitled to the Fourth Amendment protections recognized in Olson.[9] The Court disagrees.

In this case, Kimbrell testified that he had no authority to be in the Residence and that his father - the owner of the Residence - would not have allowed him to be there had Kimbrell told his father that he was breaking the conditions of his parole by leaving Tennessee and going to Georgia. Kimbrell also conceded that his father would not have authorized the use of the Residence for drug activities. Unlike in Olson, Childers was not authorized to be in the Residence because his host, Kimbrell, was not authorized to be in the Residence. Cf. Olson, 495 U.S. at 99 ("The houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest."). Thus, regardless of whether Childers was unaware that Kimbrell was not authorized by the owner to be in the Residence, he cannot bootstrap himself into Fourth Amendment protections by way of derivative rights from a person (Kimbrell) who himself was not legitimately in the Residence.

---

[9] In Olson, the Supreme Court stated,

> To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. . . . [W]e think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

Olson, 495 U.S. at 98.

As the Supreme Court has explained, "A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'" Rakas, 439 U.S. at 143 n.12. The burglar's presence is wrongful, and his expectation of privacy is not one that is legitimately recognized as reasonable. Id. Childers may have been counting on Kimbrell providing a legitimate place to stay in the Residence, but that trust was misplaced. Childers has not established that he had a legitimate expectation of privacy in a place that his host was not authorized to be. Thus, Childers has not established a right to challenge the search that was conducted pursuant to the authority of the lawful owner of the Residence.

**B.     Georgia v. Randolph**

Even if Childers had established that he could legitimately challenge the search of the Residence, his argument for suppression, based on Georgia v. Randolph, 126 S. Ct. 1515 (U.S. Mar. 22, 2006), fails. According to Childers, because he was present in the Residence and refused consent to search, the consent of the absent owner could not override his refusal. The government counters that Randolph is inapplicable in this situation because Childers did not have equal authority with Kimbrell's father over the Residence. The government has the better argument.

In Randolph, a husband and wife - each having equal authority over the dwelling - gave contradictory responses to law enforcement officials' request to search the residence for illegal narcotics. Id. at 1519. The officers searched the house without a warrant based on the wife's consent but over the husband's objection; the Georgia courts ruled that the search should not have occurred in the face of the refusal of a co-occupant who was

7

physically present. Id. The Supreme Court granted certiorari on the following question: "[W]hether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." Id. at 1520 (emphasis added). The answer: "We therefore hold that a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable to him on the basis of consent given to the police by another resident." Id. at 1526 (emphasis added).

Notably, in reaching its decision, the Supreme Court relied on an analysis of the underpinnings of the "co-occupant consent rule," and repeatedly referred to "fellow occupants," "co-tenants," "co-inhabitants," "co-ownership," and persons wanting "of any recognized superior authority." Id. at 1520-26. The Court even noted an exception to the announced rule where the "people living together fall within some recognized hierarchy, like a household of parent and child. . . . ." Id. at 1523 (emphasis added). Thus, as the government points out in its opposition to Childers's motion, the Supreme Court based its ruling on a factual circumstance where the persons offering contradictory responses to a request to search have equal authority over the premises. Here, however, neither Kimbrell nor Childers had equal authority with the owner of the Residence such that their refusal to consent to a search, which conflicted with the owner's permission to search, would create the type of situation contemplated in Randolph. In fact, neither Kimbrell nor Childers had any authority to be in the Residence, let alone to dispute the superior authority of the owner of the Residence to grant law enforcement officers permission to search.

In sum, Childers, a person not authorized to be in the Residence, could not override the owner's consent to search with his (Childers's) refusal to grant law enforcement officials access to the Residence.[10] Chief Weddon obtained verbal and written consent to search from the owner of the Residence, and there is no basis for recommending suppression of the fruits of the search based on a conflicting response from Childers.

### C.     Post-Arrest Statements

As there is scant substance to the argument for suppression of Childers's post-arrest statements, the Court presumes that Childers's argument for suppression on this point is based on the presumption that the search never should have been conducted in the first place. There is no mention of an alleged violation of Miranda v. Arizona, 384 U.S. 436, 444 (1966). Nor is there a challenge to the voluntariness of the statements. Cf. Moran v. Burbine, 475 U.S. 412, 421 (1986)("First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."). Thus, this apparent "fruit of the poisonous tree" argument seemingly hinges on the validity of the search. See Wong Son v. United States, 371 U.S. 471, 488 (1963).

As explained in detail above, the Court finds no constitutional violation concerning the manner in which the search of the Residence was conducted. Moreover, Childers failed to put on any evidence or offer any argument at the hearing concerning alleged problems with

---

[10]Childers does not contest the protective sweep done when law enforcement officials first arrived at the Residence and discovered Childers.  Nor does he contest that he gave officers permission to look in his back pack.

his interrogation after his arrest. Accordingly, the Court concludes that there is no basis for recommending that any of Childers's statements to law enforcement officials be suppressed.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**. (Doc. no. 16).

SO REPORTED and RECOMMENDED this 11th day of October, 2006, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

# United States District Court
## Southern District of Georgia

UNITED STATES OF AMERICA     \*

          vs.     \*     CASE NO. cr106-74

GARY SHANE CHILDERS     \*

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Report & Recommendation dated 10/11/06, which is part of the official records of this case.

Date of Mailing: 10/11/06
Date of Certificate: 10/11/06

SCOTT L. POFF, CLERK

By: *[signature]*

NAME:
1. Gary Shane Childers
2. Chuck Pardue
3.
4.
5.
6.
7.

Cert/Copy
- ☐ ☐ District Judge
- ☐ ☒ Magistrate Judge
- ☐ ☐ Minutes
- ☐ ☐ U.S. Probation
- ☐ ☐ U.S. Marshal
- ☐ ☒ U.S. Attorney
- ☐ ☐ JAG Office

Cert/Copy
- ☐ ☐ Dept. of Justice
- ☐ ☐ Dept. of Public Safety
- ☐ ☐ Voter Registrar
- ☐ ☐ U.S. Court of Appeals
- ☐ ☐ Nicole/Debbie
- ☐ ☐ Ray Stalvey
- ☐ ☐ Cindy Reynolds